[No. 22181. Department Two. June 4, 1930.]

C. M. CLOUD, *Respondent*, v. GREENWOOD LOGGING COM-
PANY, *Appellant*.[1]

*Theodore B. Bruener,* for appellant.
*E. E. Boner,* for respondent.

FULLERTON, J.—The appellant, Greenwood Logging
Company, is a corporation engaged in the logging busi-
ness in Grays Harbor county, in this state.  As a part

[1]Reported in 288 Pac. 910.

of its logging equipment, it owns and operates a line of railroad extending from the scene of its logging operations to tide water. The railroad is in no sense a common carrier. The appellant does not transport upon it either passengers or freight for hire, but uses the road solely for the transportation of its own products.

In the latter part of the year 1927, the appellant was desirous of extending its road, and sought to have the work of extension done by contract. The respondent, Cloud, was engaged in the business of selling explosives, and, through his dealings, had an acquaintance with contractors who performed that sort of work. McGillicuddy, an officer of the appellant, and the respondent were close friends. After the appellant had concluded to build the extension, the officer named met the respondent, told him of the appellant's intention, and asked him if he knew of a reliable person to whom a contract for the work could be let. The respondent's reply to the inquiry is not shown in the record, but shortly thereafter he spoke to one Wright about undertaking the work, but was told by Wright that he had too much work on hand at the time to undertake it. He then called up one Carlson on the long distance telephone and told him of the work. Carlson came to the appellant's place of business, bid on the work, and later the contract was let to him. Carlson, however, was not the only bidder for the work. The appellant had communicated with other contractors, who also submitted bids. Carlson was the lowest bidder, and the contract, according to the testimony of the appellant's officers, was let to him for that reason.

The contract called only for the construction of the grade for the railroad. The construction of the trestles and bridges required by the specifications was

expressly excepted. The bid was a lump sum for the completed work, to be paid in partial payments at stated intervals as the work progressed, less fifteen per cent of the amount earned at the time of such payments.

At the time of the execution of the contract, Carlson gave a bond to the appellant, with a surety, conditioned that he would perform the work in accordance with the terms of the contract, and save the appellant harmless from and indemnify it against all liens on account of labor performed and materials furnished in the performance of the contract.

Carlson substantially completed the work required under the contract. Towards the close of the work, he was found to be behind in his payments for labor and materials, and the appellant paid the labor claims direct to the claimants out of the funds due Carlson, exhausting the amount earned by him with the exception of some $200, leaving a number of material claims unpaid, among which was a claim for materials furnished by the respondent.

During the progress of the work, the respondent furnished explosives to Carlson to the value of $2,186.56. On this sum Carlson paid $750. Within the time limited by the statute, the respondent filed a lien on the road bed for the balance due. In this action, he sought to foreclose the lien. The appellant defended on the ground that the respondent had not sufficiently complied with the statutes to entitle him to a lien. After a trial of the issues, the court ruled against the contentions of the appellant, and entered a decree of foreclosure according to the prayer of the respondent's complaint.

The statute (Rem. Comp. Stat., § 1133), relating to liens of materialmen, reads as follows:

"Every person, firm or corporation furnishing materials or supplies to be used in the construction, alteration or repair of any mining claim, building, wharf, bridge, ditch, dike, flume, tunnel, well, fence, machinery, railroad, street railway, wagon road, aqueduct to create hydraulic power or any other building, or any other structure, or mining claim or stone quarry, shall, not later than five (5) days after the date of the first delivery of such materials or supplies to any contractor or agent, deliver or mail to the owner or the reputed owner of the property, on, upon or about which such materials or supplies are to be used, a notice in writing, stating in substance and effect that such person, firm or corporation has commenced to deliver materials and supplies for use thereon, with the name of the contractor or agent ordering the same, and that a lien may be claimed for all materials and supplies furnished by such person, firm or corporation for use thereon; and no further notice to the owner shall be necessary. No materialman's lien shall be enforced unless the provisions of this act have been complied with."

The respondent did not give the notice required by the statute, and it would seem at once apparent that he has no right of lien unless there is some circumstance shown which either estops the appellant from asserting the statute, or excuses the necessity of a compliance therewith. Whether there is such an estoppel or such an excuse, is the principal question presented by the record.

The court found the following facts:

"That sometime around the first of October, 1927, defendant desired to build about four miles of logging railroad for its private use in the hauling of saw logs; that defendant, through its manager and officer, J. A. McGillicuddy, said defendant being a customer of plaintiff and desiring that the explosives used on said job of building said railroad be purchased of plaintiff, went to plaintiff at his place of business in Aberdeen to learn if plaintiff had a customer who was a good

contractor to do the clearing of the right-of-way for said railroad; that plaintiff informed Mr. McGillicuddy that he had and as a result of said conversation and arrangement, sent Ed. Carlson to the said manager, J. A. McGillicuddy, and the said Ed. Carlson secured the contract for clearing the right-of-way for said railroad; that on or about the 21st day of October, 1927, defendant entered into a contract with the said Ed. Carlson for the clearing of said right-of-way of said railroad for approximately the sum of $27,000; that it was understood between plaintiff and defendant that the explosives necessary for the job would be purchased from the plaintiff and that defendant's only reason for requesting plaintiff to furnish a contractor, and plaintiff's only reason for furnishing said contractor for defendant was to secure and insure that the explosives used in this particular job would be purchased from plaintiff; that when the work aforesaid was commenced by Carlson, he procured all of his explosives from plaintiff, the first being procured about October 12, 1927, which was after the said Carlson had made arrangements to do the work and before the contract was actually signed; that, in effect, the defendant directed that the powder should be bought from plaintiff by the contractor so selected by plaintiff at the request of the defendant company, and said Carlson in purchasing said powder acted for and was the nonstatutory agent of defendant company and that the defendant company desired the contractor to purchase the explosives from the plaintiff. That from time to time and on several different occasions, the plaintiff and Mr. McGillicuddy, and likewise Mr. Fitzgerald, who is the logging foreman of the concern, discussed the matter of payment for the explosives so furnished for doing the work of clearing said railroad right-of-way, and both Mr. Fitzgerald and Mr. McGillicuddy at such times and while the said Carlson was not keeping up his payments for the explosives, but was falling behind in them, assured the plaintiff that his bill was protected by a bond taken for that purpose and likewise that under the contract with Carlson, they had agreed to and would retain 15% of the monthly

estimates on the work for the purpose of securing unpaid bills for labor and material going into the work; that plaintiff relied upon these representations and kept furnishing powder in the full belief that defendant would see that same was paid for, and plaintiff fully believed that if Carlson did not pay for the explosives so furnished by the plaintiff the bondsmen would pay for the same, or that the retained percentage aforesaid would take care of same, and it was so understood by plaintiff and defendant and the contractor and all parties concerned; that the unpaid bill of plaintiff for the explosives so furnished was $1,-436.56; that said explosives were furnished between the 12th day of October, 1927, and the 25th day of May, 1928; that such bond was taken from Carlson by the defendant with the United States Fidelity and Guaranty Company, as surety, but not filed with the county auditor.''

The court further found that Carlson did not complete his contract; that the appellant did not retain fifteen per cent of the contract price, ''as they represented to the plaintiff they would do,'' but paid it out with the acquiescence, consent and request of the bonding company. It also found that the materials furnished to Carlson by the respondent were necessary to be used in, and were actually used in, the clearing of the land for the construction of the railroad grade.

Whether these findings would justify a holding that the appellant is estopped from asserting the statute, or that its conduct was such as to constitute a waiver of the requirements of the statute, conceding that the findings were justified by the evidence, might be seriously questioned. But for much of the findings we can find no justification in the evidence. To particularize, we can find no evidence that the appellant let the contract to Carlson, desiring that the explosives used in the work should be purchased from the respondent; or that it was understood between the ap-

pellant and respondent that such explosives would be so purchased; or that the appellant's only reason for requesting the respondent to suggest a contractor was to secure and insure that the explosives to be used on the work would be purchased from the respondent; or that the appellant, in effect or otherwise, directed that the powder used in the work should be purchased from the respondent.

Not only do we find no evidence to support the findings, but the evidence, as we view it, actually negatives them. The appellant did not immediately let the contract for the work to Carlson on his appearance at the place. It merely furnished him with a copy of the plans and specifications for the work, and let the contract to him after he, in competition with other bidders, had made the lowest and best bid. The contract entered into with Carlson was in writing. It required Carlson to furnish at his own cost all of the materials necessary to be used in the performance of the work, and contained no requirement that he purchase them of any particular person or at any particular place. Nor is there any evidence that the appellant, during the progress of the work or at any time, sought to control the source from which he procured his materials. In these matters, Carlson was given a free hand by the appellant, and, in so far as the evidence discloses, bought them from dealers of his own choosing, without let or hindrance or direction on the part of the appellant.

Nor do we find any evidence to support the finding that the appellant's officers discussed with the respondent the matter of payment for the materials furnished, further than they answered such questions as the respondent asked of them concerning the situation. Relating to the finding that the appellant assured the respondent that "his bill was protected by the bond taken for that purpose," the respondent him-

self refused to so testify. He was questioned directly upon the matter by his counsel, and, after answering that he was so assured by Mr. McGillicuddy, qualified his answer in the following manner:

"Well, I don't say that Mr. McGillicuddy said that he assured me absolutely . . . He told me that the bond was up for the full amount of the job and that there was a retained 15% for the unpaid bills of Carlson."

The finding of the court that Carlson did not complete the contract is founded on the testimony of an officer of the appellant who testified "that it would take about sixty dollars to complete it; that is the whole thing; he was practically through." The record does not show that the appellant made any claim against Carlson because of the unfinished work, but does show that they treated his work as a substantial compliance with the contract.

The evidence does not show that the appellant ever promised or agreed to pay the claim of the respondent. Nor does it show that they deceived or misled him in any way. Its officers answered truthfully to all of his inquiries. Possibly, they thought, as the respondent himself thought, that the bond taken would protect the claim, but a mistake of this sort would not render their principal liable for its payment.

The bond taken by the appellant from Carlson was not filed in the office of the county auditor, as provided by § 1129, of the statute (Rem. Comp. Stat.), and it is argued that this failure subjected its property to the lien claimed by the respondent. But we think the railroad company therein referred to is a railroad company operating a railroad as a common carrier, against which public policy forbids the filing of liens, not a railroad constructed and operated wholly for private purposes, and in which the public generally

has no interest. A railroad of the latter sort is as much the private property of the owner as is any other structure he may erect. And whether he takes a bond from his contractor to protect himself against liens of laborers and materialmen, is a matter which concerns himself only. He may or he may not take such a bond, but whether he does so or not neither adds to nor detracts from the rights of laborers or materialmen furnishing labor or material in the construction of the work. Their right of lien depends upon other provisions of the statute, and upon their compliance with the terms of such statutes. Furthermore, the statute provides its own remedy for the breach of the condition. It does not give a right of lien for such a breach, but creates a personal liability, and the decree of the court in this instance would be erroneous were the statute applicable to the situation.

The appellant cites, as supporting his contention that no notice to the appellant of the furnishing of the materials was required, the following cases from our own reports: *Brace & Hergert Mill Co. v. Burbank,* 87 Wash. 356, 151 Pac. 803, Ann. Cas. 1917E 739; *Spokane Valley Lum. & Box Co. v. Dawson,* 94 Wash. 246, 161 Pac. 1191; *Miller v. Schober,* 111 Wash. 631, 191 Pac. 800; and *Colby & Dickinson v. McCulloch,* 145 Wash. 561, 261 Pac. 86. But an examination of the cases will show that the materials for which the liens were claimed were ordered by the owners or the general agents of the owners of property liened upon, not, as in this instance, by an independent contractor of the owner whose relation of agency to the owner is purely statutory.

It is our conclusion that the respondent, because of his failure to give the notice required by the statute, has no right of lien. The decree appealed from is therefore reversed, and the cause remanded with in-

270

·structions to enter a judgment to the effect that the respondent take nothing by his action.

MITCHELL, C. J., FRENCH, HOLCOMB, and MAIN, JJ., concur.